■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WELLINGTON JOHNSON JR., Appellant. [758 NYS2d 687] —Kane, J. Appeal from a judgment of the County Court of Madison County (DiStefano, J.), rendered April 9, 2001, upon a verdict convicting defendant of the crime of murder in the second degree.

The body of the victim, Frank Coleman, was found February 20, 2000, lying face down in a snowbank along Shackleton Point Road in the Town of Sullivan, Madison County. The victim was struck in the head and his larynx had been crushed. The murder occurred sometime on February 18, 2000. An investigation of the murder led to defendant, the victim's supervisor at a meat packing plant in the Village of New York Mills, Oneida County, who often drove the victim to and from work. Both were at the plant at the end of the day on Friday, February 18, 2000, which was payday.

Believing defendant to be one of the last people to have seen the victim alive, on February 21, 2000 the police asked that defendant come to the State Police barracks for a statement. Defendant voluntarily followed the investigators to the barracks, arriving there at approximately 10:40 A.M., and provided them with a detailed statement of his activities from the previous Friday, including the fact that he had found two packages of crack cocaine during the weekend which he sold. Defendant signed the statement at 7:30 P.M. Defendant also consented to a search of his vehicle. At no point during this time did defendant request to speak to an attorney.

Sometime between 8:00 P.M. and 9:00 P.M. on February 21,

2000, the State Police received a call from the City of Rome police informing them that defendant's apartment had been ransacked and burglarized. Allegedly concerned for defendant's safety, the State Police suggested that he spend the night at a motel near the barracks, which defendant did, despite the fact that he told police that he wanted to leave.[1] While defendant's version of the events varies somewhat from that of the investigators, the record reveals that at some point between the evening of February 21 and the following morning, defendant was asked to take a polygraph test. After initially agreeing to the test, he subsequently changed his mind and, on February 22, 2000, while still at the barracks, he stated that he wanted an attorney. Thereafter, as defendant was about to be driven back to his workplace by the State Police, he was detained and arrested on an outstanding warrant on an unrelated charge and brought to the Oneida County jail. A few weeks later, he was arrested for Coleman's murder and was subsequently charged in a two-count indictment for murder in the second degree.

At defendant's request, his two brothers and daughter—Alan Johnson, Matthew (Eric) Johnson and La Quanda Johnson—visited defendant in jail on February 29, 2000.[2] During the visit, defendant allegedly made inculpatory statements to his family members, including admitting to his brother Alan Johnson, inter alia, that he had used a crow bar to hit the victim and had hidden the weapon at his workplace. Defendant asked his brother to "get rid of" the crow bar. Based on what he had heard, both from defendant and other family members, Alan Johnson contacted State Police investigators and, on March 2, 2000, provided a statement in which he suggested that defendant had killed the victim. In return for his statement, Alan Johnson was paid $1,000 by the State Police and Madison County District Attorney's office.

Defendant's brother, daughter and son, Johnathon Johnson, subsequently testified before the grand jury.[3] According to the statement that La Quanda Johnson gave to police investigators, during the family's jail visit, defendant told his daughter that he had hit the victim with a crow bar and he had hidden

---

1. Defendant was accompanied by two officers who stayed with him in the motel room.

2. Although defendant's son accompanied his uncles and sister to the jail, he was not permitted to visit with his father because of some problem with proof of identification.

3. His brother Matthew Johnson and his daughter and son also provided the police with written statements.

the crow bar somewhere at work. He then allegedly asked his daughter to dispose of some possibly blood-laden gloves he had left next to the apartment building in which his daughter lived, as well as some bloody bags left in a vacant lot across the street from the building. Alan Johnson claimed that defendant said that he had used the bags to line the trunk of his car before loading the victim's body in it, and if the police found the bags and gloves, they would "put [defendant] under the jail." Alan Johnson also claimed that defendant asked Matthew Johnson to make sure that the items were disposed of and allegedly asked him if he had disposed of a pair of boots. In his statement to police, defendant's son stated that on February 19, 2000, he and his father went to the OTB parlor in Bridgeport, Madison County, leaving when it became dark. He also stated that they stopped along Shackleton Point Road, his father told him to look straight ahead, popped the trunk and got out of the car. According to defendant's son, about a minute and a half later, his father got back into the car, breathing heavily and laden with snow. Defendant then made a U-turn and headed back toward the City of Utica, Oneida County. Defendant's son claimed that on the way, defendant asked him to reach back for a pair of boots that were in the back seat and throw them out the window, but he refused because there was a car traveling behind them. At trial, the prosecution theorized that defendant killed the victim at work, wrapped the body in plastic, and placed the body in the rear hatchback of his car, where it remained for nearly a day. Defendant then disposed of the body the following evening after spending time at the Bridgeport OTB parlor.

A suppression hearing was held and County Court granted defendant's motion to suppress all of defendant's statements made after he had signed the initial written statement, finding that defendant was in custody and *Miranda* warnings were required after that point. Defendant moved unsuccessfully to preclude testimony based on Alan Johnson's statement, arguing that he was acting as an agent of the police and that the People had failed to serve a CPL 710.30 notice with respect to his testimony.

At the jury trial, defendant requested and was denied a missing witness charge concerning a forensic pathologist who had failed to testify and defendant was ultimately convicted of one count of murder in the second degree. Defendant was sentenced to a term of imprisonment of 25 years to life.

Initially, defendant contends that under *Massiah v United States* (377 US 201 [1964]) and its progeny (*see also People v*

*West,* 81 NY2d 370 [1993]), his rights under the US Constitution 6th Amendment were violated by the introduction of testimony based on statements that he had made to his brother Alan Johnson, who was acting as an agent of the police. The People do not dispute that defendant's right to counsel had attached prior to February 29, 2000, the date of the conversation defendant had with Alan Johnson.

At the suppression hearing, County Court found that the State Police had not solicited the statement. State Police Investigator Lane Newton testified that he first interviewed Alan Johnson on February 22, 2000 at his residence. Because Newton felt that Alan Johnson knew more than he was revealing, as he was leaving, Newton had a short 15-second conversation with Alan Johnson in which he mentioned that there was a fund available for persons who may provide information concerning the case. The record does not indicate that at the time the police knew of any arrangements for, or the possibility of, Alan Johnson speaking with defendant. Newton and a sheriff's investigator interviewed Alan Johnson again on February 26, 2000, at which time they learned of a planned February 29, 2000 visit to defendant at the jail. On February 29, 2000, Newton and State Police Investigator Lyle Baxter arrived at Alan Johnson's house looking for defendant's son. There was no mention of the fund, nor did police request Alan Johnson's assistance during either the February 26 or February 29 visit. On March 2, 2000, Alan Johnson contacted the State Police, indicating that he wanted to talk about something in connection with the case, and ultimately provided the State Police with a statement, for which he was paid $1,000.

A defendant's statement need only be suppressed for violation of the right to counsel if obtained by an agent of the state, as statements to private, nongovernmental entities or individuals do not fall within this exclusionary rule (*see People v Velasquez,* 68 NY2d 533, 537 [1986]). Although most informants have some hope or expectation of benefitting from providing information to the government, without the government directing the individual to the defendant, assisting the individual in obtaining statements, or making some prearranged deal, the individual who ultimately provides information to a passive governmental entity cannot be considered an agent of the government (*see United States v Johnson,* 4 F3d 904, 910-912 [1993], *cert denied sub nom. Nottingham v United States,* 510 US 1123 [1994]; *United States v York,* 933 F2d 1343, 1356-1357 [1991], *cert denied* 502 US 916 [1991]; *see also People v Cruz,* 300 AD2d 1083, 1084 [2002]). Here, the police gave Alan

Johnson no instructions, offered no assistance in obtaining the inculpatory statements, and the brief mention of the fund for confidential information constitutes, at most, "generalized encouragement" (*People v Duerr*, 251 AD2d 161, 162 [1998], *lv denied* 92 NY2d 949 [1998]). Under these circumstances, it cannot be said that Alan Johnson's conduct "became 'so pervaded by governmental involvement that it * * * invoke[d] the full panoply of constitutional protections'" (*People v Johnson*, 196 AD2d 887, 888 [1993], *affd* 84 NY2d 956 [1994], quoting *People v Ray*, 65 NY2d 282, 286 [1985]). Absent any indication that the police affirmatively played on Alan Johnson's motivation to provide the incriminating information such that the police ran "the risk of being responsible and accountable for [Alan Johnson's] actions" (*People v Cardona*, 41 NY2d 333, 335 [1977]), we find such conduct does not warrant a finding of agency for suppression purposes. Since Alan Johnson was not an agent of the police, County Court properly denied suppression of his testimony and the prosecutor was not required to provide defendant with a CPL 710.30 notice (*see* CPL 60.45 [2] [b]).

Next, we find no merit to defendant's contention that County Court erred in denying his request for a missing witness charge. In light of the fact that the pathologist from the Onondaga County Medical Examiner's office had testified as to the contents of the victim's stomach and to the time of death, defendant failed to establish that the alleged missing witness, if produced at trial, would have offered anything other than cumulative testimony (*see People v Gonzalez*, 68 NY2d 424, 430 [1986]; *People v Pierre*, 149 AD2d 740, 741 [1989], *lv denied* 74 NY2d 745 [1989]).

Furthermore, contrary to defendant's assertion, he was not deprived of a fair trial due to the ineffective assistance of counsel. The right to the effective assistance of counsel is guaranteed by the Federal and State Constitutions (*see* US Const 6th Amend; NY Const, art I, § 6). "To obtain relief on this ground under the Federal Constitution, defendant must show that counsel's performance was deficient and that this deficiency prejudiced defendant" (*People v McDonald*, 296 AD2d 13, 17-18 [2002], *lv granted* 99 NY2d 561 [2002] [citations omitted]; *see Strickland v Washington*, 466 US 668, 687 [1984]). In order to prevail on such a claim under the NY Constitution, defendant must demonstrate that he did not receive meaningful representation (*see People v Benevento*, 91 NY2d 708, 712 [1998]; *People v Baldi*, 54 NY2d 137, 146 [1981]), "which entails a review of the totality of 'the evidence, the law, and the cir-

cumstances' " as of the time of representation (*People v Kirk*, 290 AD2d 805, 806 [2002], quoting *People v Baldi, supra* at 147). "[A] simple disagreement with strategies, tactics or the scope of possible cross-examination, weighed long after trial, does not suffice" (*People v Flores*, 84 NY2d 184, 187 [1994]).

Defendant advances several arguments with respect to this claim. First, defendant claims that during voir dire and in her opening statement to the jury, counsel improperly referred to his custodial status. However, it appears from the record that both statements were designed to gauge whether jurors would be influenced by the fact that defendant had been charged and was in custody, as well as to discourage those prejudices from forming. Moreover, there is no proof that, as a result of these statements, defendant suffered any prejudice (*see Holbrook v Flynn*, 475 US 560, 567 [1986]; *People v Benevento, supra* at 713-714).

Defense counsel's trial strategy, as disclosed in her opening statement, was to convince the jury that police had "rush[ed] to judgment" in their presumption that defendant had murdered the victim. Consistent with this strategy, defendant elicited or permitted testimony concerning defendant's statement to the police that he had sold crack cocaine and he had groped a woman after they went to a bar together with the woman's boyfriend. Such strategy can be reasonably viewed as an attempt by defense counsel to establish that defendant was being truthful in his statement to the police and that his version of events seemed more credible than that of the People (*see e.g. People v Hill*, 225 AD2d 902, 902-903 [1996], *lv denied* 88 NY2d 1021 [1996]). Furthermore, testimony from defendant's children and his brother Alan Johnson, that defendant was in jail on an unrelated charge when they visited him, was also properly admitted without objection, given its consistency with defense counsel's strategy that police had "rush[ed] to judgment" in their presumption of defendant's guilt, to the exclusion of all other suspects, particularly given the testimony indicating that defendant wanted to go home after he had given his statement to police and was arrested only for the unrelated charge as he was leaving the police barracks. Although defense counsel erred in failing to request limiting instructions with respect to these uncharged prior acts, we find, under the totality of the circumstances, that the error was not so egregious as to compromise defendant's right to a fair trial (*see People v Flores, supra* at 188-189; *see also People v Snyder*, 240 AD2d 874, 875 [1997], *lv denied* 91 NY2d 881 [1997]).

Contrary to defendant's contention, defense counsel's failure

to object to testimony that defendant liked to gamble is unremarkable given that his son had already testified at length that he and defendant had gone to bet on horse races in Bridgeport the day that defendant allegedly dumped the victim's body in a nearby location, evidence which served to complete the narrative of why defendant was in Bridgeport that weekend (*see People v Till*, 87 NY2d 835, 837 [1995]). Nor do we agree that defense counsel's failure to prevent the admission of testimony from State Police Investigators Mark Dembrow and John Fallon deprived defendant of the effective assistance of counsel. First, the record indicates that defense counsel objected to certain questions that constituted hearsay. Second, a portion of the investigators' testimony did not consist of "expressive communication" (*People v Salko*, 47 NY2d 230, 239 [1979]) by a third party and, as such, falls outside the ambit of hearsay. Finally, admission of the hearsay permitted defense counsel to argue that a substantial portion of the statement provided by defendant's son had been fed to him by the police and was not based upon his own knowledge. Nor did the testimony constitute improper bolstering. Because defendant's son had contradicted his previous statement and grand jury testimony, he was a hostile witness and the testimony of Dembrow and Fallon concerning "[his] extrajudicial statements * * * cannot be said to amount to reversible error" (*People v Fuller*, 66 AD2d 27, 30 [1979], *affd* 50 NY2d 628 [1980]).

Similarly, we fail to find the elicitation of Matthew Johnson's hearsay statement, that a pair of defendant's boots left at his house was his "ticket not to get into trouble," was prejudicial to defendant as such testimony infers that Matthew Johnson, not defendant, had something to hide, expressly since defense counsel also elicited testimony that no one told Matthew Johnson to give the boots to a friend of his. The fact that defense counsel permitted and even solicited evidence that defendant withdrew his consent to have police search his car, as well as that police incorrectly thought that they had found blood therein, evinces part of a plausible trial strategy, as revealed in her closing statement, that defendant reasonably withdrew his consent for fear of police finding more phantom evidence, such as the nonexistent blood.

Finally, defendant claims that defense counsel should have sought jury charges with respect to circumstantial evidence, a coercion charge, and a prior inconsistent statement concerning defendant's daughter. Where, as here, defendant admitted his guilt to his brother and asked him to help cover up the crime, direct evidence exists and a circumstantial charge is inap-

propriate (*see People v Setless*, 289 AD2d 708, 709 [2001], *lv denied* 98 NY2d 640 [2002]). In addition, as noted above, defendant's daughter and Matthew Johnson both testified extensively as to their allegedly coerced statements. As such, " 'the fact of such earlier coercion * * * [was] disclosed to the jurors so that they [could] pass upon the witness' veracity and credibility and determine whether the testimony given in open court [was] truthful and worthy of consideration' " (*People v Reid*, 69 NY2d 469, 477 [1987], quoting *People v Portelli*, 15 NY2d 235, 239 [1965], *cert denied* 382 US 1009 [1966]). As a result, no charge to the jury was necessary, nor was the absence of one error (*see People v Reid, supra* at 477). Contrary to defendant's argument, County Court properly charged the jury concerning credibility of all witnesses in general and particularly defendant's children and brothers.

The trial record establishes that defense counsel engaged in pretrial motion practice, obtained discovery materials from the District Attorney's office, and conducted a vigorous pretrial suppression hearing. She also made cogent opening and closing statements, and thoroughly cross-examined prosecution witnesses, including attacking their credibility. As such, absent a demonstration that defense counsel's trial strategy unduly prejudiced defendant, we are satisfied that defendant was adequately represented by counsel under both the State and Federal Constitutions (*see People v Baldi*, 54 NY2d 137, 152 [1981], *supra*; *Strickland v Washington*, 466 US 668, 687 [1984], *supra*).

We have considered defendant's remaining arguments with respect to ineffective assistance of counsel and find them to be without merit.

Mercure, J.P., Crew III, Spain and Lahtinen, JJ., concur. Ordered that the judgment is affirmed.